PANHANDLE PACKING CO. v. STRING-
FELLOW. (No. 827.)*

(Court of Civil Appeals of Texas. Amarillo.
Oct. 30, 1915. Rehearing Denied
Nov. 27, 1915.)

1. CORPORATIONS ☞81—STOCK — SUBSCRIP-
TION—WAIVER OF CONDITION.

Where the subscription contract to corpo-
rate stock was that it should not be binding
until each subscriber had paid 50 per cent. of
his subscription, and a subscriber was active in
all matters preceding the organization of the
company, attended the first meeting, was chosen
as one of the directors and accepted the ap-
pointment, met with the others, the following
day, when they took steps to procure a char-
ter, which he signed and acknowledged, and was
one of the committee employing counsel to pro-
cure it, and also signed the affidavit to procure
the charter, was elected second vice president,
and, after incorporation, acted with the other
directors of the company, told a directors' meet-
ing on the day he signed the affidavit that he
had just paid half his subscription to stock at
the bank, and was also one of the committee to
whom the first 50 per cent. of subscriptions was
to be paid, such subscriber waived the condi-
tion of his subscription that it should not be
binding until half the amount was paid in, since,
where a subscriber to stock prior to organiza-
tion acquiesces in the mode of incorporation, or
participates in a corporate meeting, acts as a
director of the corporation, as a member of its
committees, attends its meetings, or votes for
its expenditures or contracts, he waives any
condition to his subscription.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 266–284; Dec. Dig. ☞81.]

2. CORPORATIONS ☞34 — STOCK — SUBSCRIP-
TION—WAIVER OF ILLEGALITY OF INCORPO-
RATION.

Where a subscriber to corporate stock took
active part in the organization of the company,
being elected director and second vice president,
he could not urge as a defense to the company's
action on his subscription that the company was
not regularly and legally organized, in that half
its capital stock had not been paid in when
its charter was issued; that being a matter of
which the state alone could complain.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 81–96; Dec. Dig. ☞34.]

3. CORPORATIONS ☞84 — STOCK SUBSCRIP-
TION—ABANDONMENT.

Where written lists of subscribers to the
stock of a corporation were secured, and there-
after the incorporators who actually obtained
the charter and made the affidavit therefor in it
named themselves as the only subscribers, such
action on the part of the incorporators did not
affect the binding effect of the mutual obliga-
tion, between the original subscribers, evidenced
by the subscription lists, and did not destroy
the right of the corporation, when organized, to
accept the lists and sue a subscriber thereto up-
on his undertaking, since the unanimous consent
of all subscribers to corporate stock is necessary
for withdrawal or cancellation of a single sub-
scription.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 296–327; Dec. Dig. ☞84.]

Appeal from District Court, Potter Coun-
ty; Jas. N. Browning, Judge.

Action by the Panhandle Packing Compa-
ny against Nannie T. Stringfellow. Judg-
ment for defendant, and plaintiff appeals.
Reversed and rendered.

Madden, Trulove, Ryburn & Pipkin and
Kimbrough, Underwood & Jackson, all of
Amarillo, for appellant. H. H. Cooper, of
Houston, for appellee.

HALL, J. Appellant sued in the district
court of Potter county, filing its amended
petition August 7, 1912, in which it is al-
leged that R. L. Stringfellow, the deceased
husband of appellee, had subscribed for 25
shares of the capital stock of appellant, of
the par value of $2,500; that by the terms of
the subscription contract, upon demand of
the executive committee of the subscribers
of stock, 50 per cent. of each subscription
should be paid to said committee, and the
remaining 50 per cent. of such subscription
upon demand of the board of directors of
appellant company, if the same should be
organized and officers selected; that by said
subscription contract it was further agreed
that, if any subscription should remain un-
paid, and it should become necessary to place
the same in the hands of an attorney for
collection, then an additional 10 per cent.
of the same should be added and paid by the
subscribers as collection fees. Appellant al-
leged its compliance with the terms and stip-
ulations of the subscription agreement and
the consequent liability of Stringfellow.

Appellee answered by general demurrer,
and specially excepted on the ground that the
petition showed upon its face that, if String-
fellow was indebted in any sum on the con-
tract, it could be for only 50 per cent., for the
reason that 50 per cent. of the payments
were required to be made to the executive
committee, and there was no allegation of
any assignment or transfer of the cause of
action from such committee. These excep-
tions were overruled.

Appellee answered further by general de-
nial and two special defenses as follows:
(a) That said corporation could not recover
under the terms of the subscription contract,
for the reason that it was specially stipu-
lated that each subscriber should pay 50
per cent. of his subscription before the con-
tract should become binding; (b) because
such subscription contract was abandoned,
and the company was organized upon an en-
tirely different subscription contract, in that
certain persons, including the said R. L.
Stringfellow, had subscribed for all of the
shares of stock in said corporation, and had
thereby abandoned the subscription contract
sued upon. It is further alleged that appel-
lant is estopped by reason of the organiza-
tion of the company upon another and dif-
ferent subscription list and by its representa-
tions as to said list made to the secretary
of state in procuring the charter.

Appellant filed a supplemental petition, al-
leging that Stringfellow had waived all pro-
visions of the subscription contract requir-
ing payment of his subscription, and that, if

Stringfellow and the other incorporators did, in fact, represent that all the stock was subscribed by them, the said Stringfellow and his attorney induced such action, and the Panhandle Packing Company was not bound thereby.

The case was submitted to the jury upon six special issues, which, with the answers thereto, are as follows:

"First. Did the incorporators of the Panhandle Packing Company, to wit, O. W. Butt, W. H. Fuqua, H. B. Sanborn, T. S. Bugbee, O. H. Nelson, H. R. Morrow, and R. L. Stringfellow, at the time they adopted the charter read in evidence before you, intend to ignore and repudiate the several stock subscription lists dated May 20, 1908, offered in evidence before you, or did they adopt this method for convenience, intending that the subscribers to said subscription lists should take and pay for the stock according to the lists? Answer: (A) Yes. (B) No.

"Second. Did R. L. Stringfellow, without paying any part of the stock subscription, unite with said Butt, Fuqua, Sanborn, Bugbee, Nelson? Did Morrow, in taking out the charter of the Panhandle Packing Company, act as a director and vice president of the company after the charter was obtained until his death, and, if so, did he by so doing intend to waive the requirement in the subscription lists that each subscriber pay 50 per cent. of his subscription before a charter should be obtained? Answer: Yes.

"Third. Did the incorporators, by their act, in applying for the charter of plaintiff company, the organization of such company after the charter was issued, and proceeding with the work and business of the corporation, intend to waive the requirement of the subscription lists that each individual subscriber should pay 50 per cent. of his subscription before a charter could be obtained? Answer: Yes.

"Fourth. Which subscriptions did the Panhandle Packing Company accept and act upon after it was incorporated, the signed lists in evidence before you, or the oral subscriptions made by said incorporators at the time the affidavit introduced in evidence was made? Answer: The oral lists.

"Fifth: Did the said incorporators, in making application for the charter, and in making the affidavit that 50 per cent. of the total capital stock had been paid in, take into account the moneys theretofore paid in by the several subscribers on the stock subscription lists, and use such moneys to make up the 50 per cent.? Answer: No.

"Sixth. Did the said incorporators take out the charter of the Panhandle Packing Company for and on behalf of the subscribers to said several stock subscription lists in evidence before you, or did they agree among themselves to subscribe for themselves the entire amount of the capital stock at the time they applied for the charter and made the affidavit which accompanied said charter to the secretary of state? Answer: (a) No. (b) Yes."

The subscription contract, among other terms, stipulates that the undersigned subscribed for the amount of stock set opposite their respective names; that 50 per cent. thereof should be paid upon demand of an executive committee, composed of R. L. Stringfellow and four other citizens, and the remaining 50 per cent. at such time and in such amounts as the board of directors of the corporation, after its formation, should require; that the corporation should have the right to issue and offer for sale mortgage bonds in an amount not exceeding $100,000, payable on or before ten years after date. There is a provision for 10 per cent. attorney's fees in the event it should become necessary to file suit against any subscriber for the collection of the amount due, and contains this stipulation:

"It is understood that the subscription hereto is not binding until the full amount of $150,000 is subscribed, and must be paid before a charter can be obtained."

R. L. Stringfellow's name appears amongst other subscribers in the amount of $2,500. The list is dated May 20, 1908, and is one of nine similar lists which was being circulated for the purpose of obtaining subscriptions.

The secretary of state testified by deposition that in order to procure a charter O. W. Butt, W. H. Fuqua, O. H. Nelson, H. R. Morrow, T. S. Bugbee, H. B. Sanborn, and R. L. Stringfellow filed an affidavit with him made before H. H. Cooper, a notary public of Potter county, stating in substance, that Butt had subscribed for 750 shares and paid $50,000 thereon; that Sanborn subscribed for 200 shares and paid the sum of $10,000; that Fuqua had subscribed for 125 shares and paid $6,250; that Nelson had subscribed for 125 shares and paid $6,250; that Bugbee had subscribed for 100 shares and paid $5,000; that Morrow had subscribed for a like number of shares and paid the same amount; that Stringfellow had also subscribed for 100 shares and paid the sum of $5,000.

During the trial the death of Stringfellow on the 9th of May, 1909, was admitted. It appears that a meeting was held at the courthouse on October 9, 1908, for the purpose of electing directors for the proposed corporation for the first year, at which there was in attendance in person or by proxy over 80 per cent. of the subscribers to stock, and R. L. Stringfellow was named as one of the directors. On the following day the directors held a meeting to choose officers and take the necessary steps to obtain a charter. At this meeting Stringfellow was elected second vice president, and was also selected as one of a committee of three to draft by-laws, and to procure the assistance of an attorney in drawing the charter. It was further shown that Stringfellow attended two directors' meetings held on January 6, 1909. The preliminary plans adopted for the formation of the company included the circulation of the subscription lists and an agreement that the several banks in Amarillo were made depositories for the funds to be collected on subscriptions, and the presidents of the banks were constituted an executive committee for collecting and receiving the funds pending the procuring of the charter. R. L. Stringfellow was president of this committee. The books of the Panhandle Packing Company were kept by Francis Popham, who was secretary-

treasurer of the corporation, and he testified that collections on subscriptions were made by the committee named in the subscription lists prior to incorporation; that the money so collected was deposited in the several banks according to the plans above stated; that the collections on the subscription lists continued after the incorporation of the company, and were handled in substantially the same manner; that the charges made on the books of the company against the banks and the credits taken on the part of the company were made on amounts represented to have been collected by the banks themselves; that prior to November 27, 1908, all subscribers had been notified to pay in 50 per cent. of their subscriptions. The minutes of April 13, 1909, show the call made by the corporation for the second installment of 50 per cent. The witness testified that he spoke personally to Mr. Stringfellow about his subscription. It was shown that in due time the company went forward with the construction of the plant; that it was finally completed and equipped for work. Francis Popham testified, further, that the subscriptions, as shown on the several lists, were transferred by him to the books of the company; that collections were made on these subscriptions by the committee named in the lists prior to incorporation, as well as thereafter.

On October 27, 1908, the date of the application for charter, it appears that Butt had paid $50,000 upon his subscription of $75,000, and that of the remaining $75,000 only $24,583 had been paid, aggregating $74,583 actually paid toward the capital stock of the company upon the subscription lists sued upon herein. It further appears that there were 143 subscribers, representing 261 shares, who had paid nothing upon their subscription.

The appellant at the close of the testimony requested a peremptory instruction in its favor, which was refused. The court entered judgment for the appellee upon the findings of the jury, and from this judgment the appeal is prosecuted.

[1, 2] The appellee's first defense, based upon the fact that 50 per cent. of each subscription had not been paid at the time of incorporation, cannot be upheld in the light of the uncontroverted facts. The record shows without dispute that Stringfellow was active in all of the matters preceding the organization of the company; that he attended the first meeting on October 9, 1908; was there chosen as one of the directors for the first year; that he accepted the appointment and met with the other directors the following day and took steps to procure a charter. He is one of the parties who signed and acknowledged the charter, as well as one of the committee employing counsel to procure it. He signed the affidavit filed with the secretary of state in order to procure the charter, was elected

second vice president, and after incorporation acted with the other directors in the management of the company. It is further shown that on the day the affidavit mentioned above was signed he left the directors' meeting, went down to his bank for the pretended purpose of paying one-half of his subscription and upon his return reported that the matter had been arranged. He was also one of the committee of citizens to whom the first fifty per cent. of subscriptions was to be paid. We think under the law he waived this condition of his subscription, if, indeed, the contract can be construed to mean that he should not become liable until 50 per cent. of each subscription was paid. It is said in Bowers on the Law of Waiver (section 228 et seq.):

"But performance of the condition of a subscription for stock is not always requisite to render the contract enforceable. A subscriber is not bound to insist upon it. He has the right to do so, but may waive the right, or, in other words, may forego its benefits."

Section 229, Id.:

"A common condition inserted in the agreement of subscription upon the organization of a corporation is that there shall be a certain number of shares of the capital stock, and that a designated sum shall be paid for each share, and in other instances statutory provisions require a definite number of shares to be subscribed and a certain part of the capital stock to be paid in. In either event the stipulation or requirement must be fulfilled or the subscription does not become effectual so that payment thereof can be enforced."

Section 230, Id.:

"But these provisions or conditions are solely for the benefit of the subscriber, and he has the right to take advantage of them or not, as he may desire. He may rely upon them as a defense in an action upon a subscription, or he may so declare or conduct himself as to preclude such defense. In other words, he may waive the performance of such conditions, and in such event will be held to payment of the amount subscribed. A variety of facts and circumstances have been held to amount to a waiver of the conditions under consideration. Thus, if a subscriber to stock in a corporation subscribes prior to incorporation, he waives the defense that the capital stock of the corporation has not been subscribed, as provided for in his contract by acquiescing in the mode of incorporation, with knowledge of all the facts; or, if he know that the whole amount of the capital stock has not been subscribed, yet participate, in a corporate meeting, the condition is waived, and the subscription rendered absolute; and the same effect results where he acts as a director of the corporation or as a member of its committees, and likewise if he attend meetings, vote for expenditures or for making contracts, and do other acts which could be consistent only with an intention to proceed with his subscription and shares as if all the conditions had been complied with, a waiver will be imputed to him." Cook on Stocks & Stockholders, §§ 181 to 198; Taylor Private Corporations, § 519; 7 R. C. L. "Corporations," §§ 83 and 396, and authorities cited.

In so far as the defenses attack the regularity and legality of the incorporation of the company, we think Stringfellow, by his conduct, has precluded himself from urging them, even though they were available to a stockholder. Although 50 per cent. of the

capital stock had not been paid in at the time the charter was issued, this is a matter of which the state alone can complain. Dillard v. McAdams Lumber Co. (Cr. App.) 141 S. W. 1023; Conley v. Daughters of Republic of Texas (Sup.) 157 S. W. 937, 156 S. W. 197.

[3] The next defense urged by appellees is that the subscription contract, upon which the suit was filed, was abandoned by the incorporators, and that the organization was effected under an oral subscription, as evidenced by the affidavit filed with the secretary of state. In reply to this contention appellants insist that an oral subscription is void. The general rule seems to be that oral subscriptions to the capital stock of proposed corporations are valid, though it has been held in states where the statute requires all subscribers to stock to execute formal articles of incorporation that oral agreements to take stock are not enforceable. 7 R. C. L. "Corporations," § 195; 136 Am. St. Rep. 743, note (b); Somerset National Banking Co. v. Adams (Ky.) 72 S. W. 1125; 10 Cyc. 391, note 33.

Article 1123, R. S. 1911, does not require that more than three of the organizers of a corporation shall sign the application for charter, and we see no reason why the general law governing the formation of contracts should not apply to subscriptions to the capital stock of corporations. Aside from this question, we believe that the subscription contract sued upon was binding upon all of the subscribers, and that the incorporators who actually obtained the charter and made the affidavit could not arbitrarily set it aside and bring into existence the proposed company upon a separate subscription undertaking; nor could they avoid liability on the written subscription previously signed by them. It is held in Belton Compress Co. v. Saunders, 70 Tex. 702, 6 S. W. 136:

" 'The agreement under consideration not only bears on its face the evidence of a consideration founded on the pecuniary advantage of membership, but also upon mutual promises expressed as clearly as words can speak. The mutual promises of the several subscribers constitute the consideration, but the promise is to pay the subscription to a third party, viz., the corporation, and the promise is valid and binding notwithstanding the corporation is to be formed thereafter.' It is stated in Angell & Ames on Corporations that: 'The consideration which is necessary to sustain such a promise is raised by inference of law from the subscription itself and the privileges thereby conferred; and, from the same circumstance, the law will infer a duty to pay for the stock, and an implied obligation of equal force with an express contract, where nothing appears repugnant to such construction. As was said by Mr. Justice Sutherland, delivering the judgment of the court in Spear v. Crawford, 14 Wend. (N. Y.) 20 [28 Am. Dec. 513]: "The promise of the defendant and the other subscribers, although it is in form to take the shares subscribed by them respectively, is undoubtedly (when taken in connection with what precedes it, and with the act of incorporation which is there referred to,

and in part recited) a promise, not only to take the shares, but to pay for them; to take them upon the terms and conditions set forth in the subscription paper." ' * * * It is further said by the same author: 'A person subscribing before the organization of a proposed incorporated joint-stock company raises a mutuality in his contract which will render him liable to the company after incorporation.' "

In the case of Steely v. Texas Improvement Co., 55 Tex. Civ. App. 463, 119 S. W. 319, Neill, J., said:

"It is held in some jurisdictions that, where a number of persons sign a subscription paper agreeing to take stock in a corporation to be thereafter formed by them, there is a contract between subscribers themselves to become stockholders, without further act on their part, immediately upon the formation of the corporation, binding and irrevocable from the date of the subscription, unless canceled by consent of all the subscribers before acceptance by the corporation, and a continuing offer to the proposed corporation, which, upon acceptance by it after its formation, becomes, as to each subscriber, a contract between him and the corporation. See 10 Cyc. 388, and note 13, for cases cited, among which is Belton Compress Co. v. Saunders, 70 Tex. 699, 6 S. W. 134, in support of this principle. Cook on Corporations, §§ 71, 72; 1 Thomp. Corporations, § 1205. It may be stated as a corollary to this principle that a subscriber to such subscription paper cannot withdraw or obtain a cancellation of his subscription except by the unanimous consent of the other subscribers."

No attempt was made to prove that Stringfellow ever withdrew his subscription or endeavored to obtain the consent of the other subscribers that he might do so. Stringfellow, Nelson, Butts, Fuqua, Morrow, Bugbee, and Sanborn must be held to have been acting in a representative capacity in procuring the charter upon the affidavit filed by them. They could not, without the unanimous consent of all the subscribers, set aside the contract formally entered into between them. See, also, 7 R. C. L. "Corporations," §§ 193, 196.

In procuring the charter, Stringfellow acted as one of a committee appointed by his cosubscribers for that purpose. He was their agent to perfect the incorporation of the identical company named in the subscription lists. It is clear from this record that no other or different company was incorporated; in fact, appellee make no contention to the contrary. Although the committee may have concluded that a more direct method of accomplishing the desired end was to file the above-mentioned affidavit with the secretary of state naming themselves as the only subscribers, it did not set aside or in any way modify the binding effect of the mutual obligation existing between the subscribers and evidenced by the subscription lists; nor did the affidavit destroy the right of the corporation when organized to accept the lists and sue upon the undertaking entered into by the subscribers. One cannot violate the fiduciary relation existing between himself and his co-obligors and be allowed to profit by his own wrong. This record does not disclose any such intention upon the part of

any of the incorporators, and we are not willing to impute such motive to them. Upon the whole record, we are convinced that the court should have entered judgment for appellant upon the second and third special issues, and the answers of the jury thereto. As we understand the law, it is immaterial whether the incorporators intend to ignore the stock subscription lists or not. They could not lawfully do this without the consent of all the other subscribers; nor could the company do so after its incorporation. Whether Stringfellow and the other members of the special committee intended to file the charter in behalf of all subscribers or for themselves only, and whether they took into account the money on hand which had been paid in by the several subscribers in making the affidavit, are all matters of no moment under the principles of law announced above.

The remaining special issues submitted immaterial questions upon which a judgment could not have been based. What is here said disposes of all other material matters raised by the assignments not considered in detail.

The judgment is reversed, and here rendered in favor of appellant for $2,500, with interest at 6 per cent. from April 13, 1909, and 10 per cent. of principal and interest as attorney's fees.

Reversed and rendered.

HENDRICKS, J., not sitting.